UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI REA,

     Plaintiff,

v.

BANK OF AMERICA, N.A.,

     Defendant.

Case No. 4:17-cv-12388

Honorable Linda V. Parker

Magistrate Stephanie Dawkins Davis

---

LAW OFFICE OF GREGORY T. GIBBS
By:  Gregory T. Gibbs (P26440)
     Alec S. Gibbs (P73593)
717 S. Grand Traverse
Flint, MI 48502
(810) 239-9470
greggibbs51@sbcglobal.net
gibbsale@gmail.com

LAW OFFICE OF ANN A. LERCHE
By:  Ann A. Lerche (P33331)
717 S. Grand Traverse
Flint, MI 48502
(810) 239-9470
annlerche@gmail.com


*Counsel for Plaintiff*

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.
By:  Elizabeth P. Hardy (P37426)
     Thomas J. Davis (P78626)
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@kohp.com
tdavis@kohp.com


*Counsel for Defendant*

---

**Defendant's Motion for Summary Judgment**

Defendant Bank of America ("the Bank"), by its attorneys, Kienbaum Opper-

wall Hardy & Pelton, P.L.C., moves for an order pursuant to Fed. R. Civ. P. 56(c)

granting summary judgment on Plaintiff's sole claim. In support of its motion, the Bank states the following:

1.     Plaintiff filed her complaint on July 24, 2017. *See* R. 1, Complaint. Discovery closed on September 5, 2018.  R. 28, Amended Scheduling Order.

2.     For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims there stated, and the Bank is entitled to judgment as a matter of law.

3.     Defendant's counsel attempted to obtain concurrence in this motion, but did not receive a response. However, Defendant has made prior requests for Plaintiff to voluntarily dismiss this suit due to its lack of merit, with those requests rebuffed. Thus, this motion is necessary.

WHEREFORE, the Bank respectfully requests that the Court grant summary judgment on the sole count of Plaintiff's complaint.

Respectfully submitted,

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.

*s/Thomas J. Davis*
By:   Elizabeth P. Hardy (P37426)
        Thomas J. Davis (P78626)
Attorneys for Defendant
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
Dated:  November 27, 2018        tdavis@kohp.com

-2-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORI REA,

     Plaintiff,

v.

BANK OF AMERICA, N.A.,

     Defendant.

Case No. 4:17-cv-12388

Honorable Linda V. Parker

Magistrate Stephanie Dawkins Davis

---

LAW OFFICE OF GREGORY T. GIBBS
By: Gregory T. Gibbs (P26440)
    Alec S. Gibbs (P73593)
717 S. Grand Traverse
Flint, MI 48502
(810) 239-9470
greggibbs51@sbcglobal.net
gibbsale@gmail.com

LAW OFFICE OF ANN A. LERCHE
By: Ann A. Lerche (P33331)
717 S. Grand Traverse
Flint, MI 48502
(810) 239-9470
annlerche@gmail.com

*Counsel for Plaintiff*

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.
By: Elizabeth P. Hardy (P37426)
    Thomas J. Davis (P78626)
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
tdavis@kohp.com

*Counsel for Defendant*

---

**Defendant's Brief in Support of Motion for Summary Judgment**

## Concise Statement of Issue Presented

Whether the Court should grant summary judgment to Defendant Bank of America on Plaintiff's sole claim of FMLA retaliation?

# Table of Contents

Concise Statement of Issue Presented ........................................................ ii

Controlling or Most Appropriate Authorities............................................. iv

Introduction ...............................................................................................1

Background .................................................................................................2

    A.    Bank of America Night Drop Policy.....................................................2

    B.    Bank of America Code of Conduct. ....................................................3

    C.    Plaintiff Lori Rea's Employment and FMLA History ........................4

    D.    On August 4, 2015, Rea falsifies a night drop log, admits she did so to avoid an audit finding, and is terminated........................6

    E.    Procedural History..............................................................................10

Argument....................................................................................................11

I.    Rea cannot establish a *prima facie* FMLA retaliation claim. ........................13

    A.    The decision-maker Fabrie was unaware of Rea's FMLA leave, and thus cannot have retaliated as a matter of law. .................13

    B.    Because Rea's admitted records falsification was undisputedly grounds for immediate termination, Rea cannot show that FMLA leave was a "but for" cause of the termination...................................................................................15

II.    Rea cannot show that her termination for records falsification was pretext for FMLA retaliation. ...............................................................20

Conclusion .................................................................................................24

# Controlling or Most Appropriate Authorities

## Cases

*Arban v. W. Pub. Corp.*,
   345 F.3d 390 (6th Cir. 2003) ................................................................17

*Baqir v. Principi*,
   434 F.3d 733 (4th Cir. 2006) ...............................................................16

*Ferrari v. Ford Motor Co.*,
   826 F.3d 885 (6th Cir. 2016) ...............................................................15

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) .............................................................................16

*Lewis v. Humboldt Acquisition Corp.*,
   681 F.3d 312 (6th Cir. 2012) ...............................................................16

*Lindsey v. Walgreen Co.*,
   615 F.3d 873 (7th Cir. 2010) ...............................................................16

*Martinez v. Cracker Barrel Old Country Store, Inc.*,
   703 F.3d 911 (6th Cir. 2013) ...................................................... 22, 23

*Martino v. MCI Commc'ns Servs., Inc.*,
   574 F.3d 447 (7th Cir. 2009) ...............................................................16

*Pierce v. Commonwealth Life Ins. Co.*,
   40 F.3d 796 (6th Cir.1994) ..................................................................22

*Seeger v. Cincinnati Bell Tel. Co., LLC*,
   681 F.3d 274 (6th Cir. 2012) ...............................................................20

*Sharp v. Profitt*,
   674 F. App'x 440 (6th Cir. 2016) .........................................................16

*Smith v. Bank One, N.A.*,
   2000 WL 1206536, 229 F.3d 1153 (6th Cir. 2000) .............................22

*Sybrandt v. Home Depot*,
   560 F.3d 553 (6th Cir. 2009) ...............................................................22

*Tennial v. United Parcel Serv., Inc.*,
   840 F.3d 292 (6th Cir. 2016)................................................................13

Univ. of Texas Sw. Med. Ctr. v. Nassar,
   133 S.Ct. 2517 (2013) ......................................................................16

*Vickers v. UPS, Inc.*,
   898 F.2d 155 (6th Cir. 1990)............................................................21

*Wexler v. White's Fine Furniture, Inc.*,
   317 F.3d 564 (6th Cir. 2003)............................................................15

*Woida v. Genesys Reg'l Med. Ctr.*,
   4 F. Supp. 3d 880 (E.D. Mich. 2014)................................................16

## Statutes

29 C.F.R. § 825.302 (e)............................................................................15

29 C.F.R. § 825.302(a)............................................................................15

## Other Authorities

*Prosser & Keaton on Torts* 265 (5th ed. 1984) .....................................16

## Introduction

Bank of America terminated financial center manager Lori Rea because she falsified a bank record. Rea and her assistant manager opened her branch's night deposit vault at 11:20 am—over two hours late—but instead of noting that time in the night deposit log, she falsely recorded that she had opened it at 8:58 am. Rea has admitted that this was serious misconduct, and that her motive was to conceal that she had violated policy, and created an audit issue, by not timely opening the vault.

There is no doubt that Rea's act of falsification warranted termination. Falsification is a serious offense, particularly for a manager. The Bank's "Advice & Counsel" unit, responsible for recommending employee discipline, has written guidelines that explain that falsifying a record in order to avoid an audit finding should result in termination, even for an employee with no prior discipline. Thus, Rea was terminated, and the assistant manager who falsified the record with Rea was also terminated. And Rea has admitted under oath that she was unaware of *any* manager at Bank of America who falsified a bank record but was not terminated.

Nevertheless, Rea brought this lawsuit alleging that she was actually terminated because she had earlier applied for and used FMLA leave. This argument is meritless. While Rea accuses her former boss Heather Subran-Marsh as being unsympathetic to Rea's FMLA leave requests—with baseless, conspiratorial speculation that Subran-Marsh "understaffed" the center to make Rea nervous about taking

leave, among other things—Rea admits that her leave was approved, and that Rea was never prohibited from using any leave days she requested. But Rea's attacks on Subran-Marsh are entirely irrelevant because Subran-Marsh had already transferred by the time Rea falsified the bank record in 2015, and she had no role in Rea's termination. The actual decision-maker, Stacey Fabrie, did not know of Rea's FMLA status, and she consulted with two other Bank employees who also agreed that Rea's misconduct warranted termination. Summary judgment should be granted.

## Background

**A.     Bank of America Night Drop Policy.**  In order to accommodate clients who need to make after-hours deposits, many Bank of America financial centers offer a night depository box. Tab A, Marsh Decl. ¶ 3. Bank policy is that the night depository must be opened once per business day, as close to the time the financial center lobby opens, although "[t]imes may vary for financial centers due to staffing and/or other circumstances." *Id.* ¶ 4 & Decl. Ex. 1, p.1 Deposits removed from the vault are credited to the customer as having been received that day. *Id.*

Under the Bank's "Removing Night Depository Contents" policy, two employees must open the vault together—usually one employee entering a combination, and the other using a key—a process known as "dual control." *Id.* p. 1. The time the vault is opened must be recorded on a Night Depository Vault Opening/Record Log. *Id.* ¶ 4 & Decl. Ex. 1, p. 2 (Step 2). Once the contents are removed and the

vault is closed, the time the vault was closed must also be recorded on the log. *Id.* (Step 7). The log is retained, so it may be inspected by auditors to ensure that the financial center is complying with night drop policy. *Id.* ¶ 5 & Decl. Ex. 1, p. 4 (Step 14); *accord* Tab B, 2018 Rea Dep. 91-92. Logs indicating that the night-drop vault was opened late may result in an audit "finding" – that is, a loss of points on the overall audit. Tab A, Marsh Decl. ¶ 5; Tab B, 2018 Rea Dep. 163.

  **B.** **Bank of America Code of Conduct.**  As an institution entrusted with its customers' finances, Bank of America must uphold public trust and confidence, and it requires its employees to act accordingly. Tab A, Marsh Decl. ¶ 6. The Bank thus explicitly prohibits "Acts of dishonesty" and "Falsifying company records or documents." Tab B, 2018 Rea Dep. Ex. 5, p. 2. The Bank's Code of Conduct makes clear that "[a]ccurate record keeping and reporting reflects on our reputation, our integrity, and our credibility" and provides that employees "must maintain accurate books and records consistent with business needs and legal requirements." Tab A, Marsh Decl. ¶ 6, Decl. Ex. 2 at BOA 00544. And managers have "special obliga-tions" with respect to Bank policy and procedure. *Id.* at BOA 543. They must "lead by example," maintain an ethical workplace, avoid abusing their position, and make sure that team members are aware of the Code and Bank policy and procedure. *Id.*

  The Bank also has an Advice & Counsel ("A&C") unit comprised of experi-enced human resource specialists who offer guidance to managers on many topics,

including discipline for violation of bank policy. Tab C, Dubman Decl. ¶ 3. A&C agents have access to various guidelines on how to handle violations, including guidelines related to falsification of bank documents. *Id.* ¶ 9 & Decl. Ex. 2. Consistent with Bank of America's Code of Conduct, intentionally providing false information in a bank document—which expressly includes "night deposit logs"—usually warrants termination, even for a first offense. *See id.* An exception is made in cases where an associate's falsification is done at a manager's direction; in these cases "termination is generally recommended for the manager and a Final written warning for the associate(s) involved." *Id.* ¶ 13 & Decl. Ex. 2 at BOA 00522.

### C.   Plaintiff Lori Rea's Employment and FMLA History

Lori Rea was a financial center manager at the Bank's Highland/Milford Center. Tab D, 2017 Rea Dep. 6. She had worked for Bank of America since the Bank acquired Rea's former employer LaSalle Bank. Tab B, 2018 Rea Dep. 25; Tab E, Records Decl. ¶ 3. Rea was familiar with the contents of Bank of America's Employee Handbook (which includes the prohibition on acts of dishonesty and falsification of documents), as well as bank policies and procedures. Tab B, 2018 Rea Dep. 41-44 & Dep. Ex. 5, p. 2. Rea also completed training on the Bank's Code of Conduct in 2014 and 2015. Tab E, Record Decl. ¶ 4 & Decl. Ex. 1 (*see* final page of exhibit). And Rea had been given written warnings in the past due to issues with audits. *Id.* ¶ 5 & Decl. Ex. 2; Tab B, 2018 Rea Dep. 174-75.

Rea first applied for FMLA leave in July 2011 for a surgery. *Id.* ¶ 6 & Decl. Ex. 3; Tab B, 2018 Rea Dep. 66. Her supervisor at the time was Stacey Fabrie. Tab E, Records Decl. ¶ 7. Rea applied for leave through the Bank's third-party FMLA administrator Aetna; it was approved, she used the leave, and returned to work. *Id.* ¶ 6; Tab B, 2018 Rea Dep. 66-68. She has no complaints about that leave. *Id.*

In September 2014, Rea applied for intermittent FMLA leave to care for her sick mother, with that leave re-approved in January 2015 and July 2015. Tab B, 2018 Rea Dep. 81, 151; Tab E, Records Decl. ¶ 6. As before, the leave requests were made to Aetna. *Id.* ¶ 6. Rea received materials from Aetna explaining (consistent with federal law) that to use her leave, she must provide notice and "generally must comply with an employer's normal call-in procedures." Tab N at Rea 000018; *cf.* 29 C.F.R. § 825.303. The call-in procedure for an emergency absence was to inform her supervisor that she would be absent (with the supervisor tasked with finding coverage, if needed.) Tab A, Marsh Decl. ¶ 7; *see also* Tab B, 2018 Rea Dep 48, 118. These intermittent leaves were approved while Consumer Market Manager Subran-Marsh was Rea's supervisor. Tab B, Rea Dep. 151-52; Tab E, Records Decl. ¶¶ 6, 8.

When Rea needed to actually use intermittent leave time, she would contact Aetna within 48 hours after using the leave; as Rea admitted, none of her requests were ever denied. Tab B, Rea Dep 71-72. Rea also admitted that no one at the Bank ever told her that she *couldn't* use a leave day. Tab B, 2018 Rea Dep. 101. Moreover,

Rea could only identify one day where she felt she needed to use intermittent leave but did not use it: an instance where Rea's father brought her ill mother to the branch. *Id.* at 120-22. Rea did not know that her mother needed assistance until that moment, but she admittedly did not contact her supervisor or otherwise try to use leave. *Id.*

On August 1, 2015, Subran-Marsh's title changed to Operations Market Manager ("OMM") and she was transferred to a different region. Tab A, Marsh Decl. ¶ 2. Two new supervisors—OMM Stacey Fabrie and Consumer Banking Market Manager Marie Warner—became responsible for supervising different aspects of the Highland/Milford branch. Tab D, 2017 Rea Dep 33:10-16; Tab E, Records Decl. ¶ 9; Tab F, Marsh Dep. 36-37; Tab L, Warner Dep. 13-14. Rea testified that she assumed that Subran-Marsh informed her new "bosses" that Rea had been approved for FMLA leave; in fact, her assumption was wrong.[1] Tab A, Marsh Decl. ¶ 8, Tab B, 2018 Rea Dep. 175-78; Tab D, 2017 Rea Dep. 175-76; Tab G, Fabrie Decl. ¶ 3. Rea did not use leave time in August 2015. Tab E, Records Decl. ¶ 6; Tab D, 2017 Rea Dep. 55, 65-66; 120-121 & Dep. Ex. 24 (excerpt of Rea journal).

**D.    On August 4, 2015, Rea falsifies a night drop log, admits she did so to avoid an audit finding, and is terminated.**  On August 4, 2018—mere days after Fabrie became Rea's OMM—Rea engaged in an admitted act of record falsification

---

[1]Indeed, Rea did not identify any complaints about Fabrie during the short time in August 2015 that Fabrie supervised her. Tab B, 2018 Rea Dep. 177-78.

that led to her termination, and the termination of assistant manager Amy Thickstun who aided her. Tab D, 2017 Rea Dep. 128-29. Per policy, the night drop was supposed to be opened shortly before the center opened at 9:00 am. Tab A, Marsh Decl. ¶ 4; Tab B, 2018 Rea Dep. 162. Rea realized around 11:00 am that the night drop had not yet been opened. Tab B, 2018 Rea Dep. 160. She and Thickstun then opened the night drop, removed the contents, and then falsely wrote down in the night drop log that they had opened the vault at 8:58 am. Tab B, 2018 Rea Dep. 160-61; Tab H, Salomon Decl. ¶¶ 6-9.

Teller Roxanne Magnusson, who was temporarily assisting at Highland/Milford, reported the falsification to OMM Stacey Fabrie. Fabrie initiated a corporate investigation on August 5, 2015. Tab B, 2018 Rea Dep 54-55; Tab I, Fabrie Dep. 19-20, 35 & Dep. Ex. 1.  The matter was assigned to Deborah Salomon, a Senior Internal Investigator with 25 years' experience. Tab H, Salomon Decl. ¶¶ 2-4. Salomon asked Fabrie to obtain copies of the night drop log, and confirmed through surveillance footage that Rea and Thickstun had opened the night drop log on August 4, 2015 at 11:20 am and closed it at 11:22 am. *Id.* ¶¶ 6-7 & Decl. Ex. 5. The night drop log for August 4, 2015, however, stated that it was opened at 8:58 am. *Id.* & Decl. Ex. 4.

On August 11, 2015, Magnusson reported a new incident involving Thickstun and personal banker Sean Yesko. Tab C, Dubman Decl. ¶¶ 12-13 & Decl. Ex. 1; Tab I, Fabrie Dep. 18. Yesko had a customer who needed a debit card, so Magnusson and

Yesko properly opened a safe to retrieve some cards. Tab J, Yesko Dep. 10-11; Tab I, Fabrie Dep. 24-25. Yesko returned to his customer without immediately signing the debit card control log, and Magnusson did not sign it either as she had to report to another branch. Tab C, Dubman Decl. ¶¶ 11-12 & Decl. Ex. 1; Tab J, Yesko Dep. 10-11. Instead, Amy Thickstun said she'd take care of it. *Id.* Yesko ultimately signed the log (as he should have done), but Thickstun signed her name as the second dual-control employee even though she had not herself opened the vault. Tab C, Dubman Decl. ¶¶ 11-12; Tab I, Fabrie Dep. 25; Tab J, Yesko Dep. 10-11.

On August 19 and 20th, Salomon interviewed Rea and Thickstun regarding the incident. Tab H, Salomon Decl. ¶¶ 8-9. Rea admitted to knowingly recording a false time the night drop log, but offered various excuses. *Id.* ¶ 8 & Decl. Ex. 1, 6; *see also* Tab B, 2018 Rea Dep. 166-70. Rea told Salomon that she was aware that the night drop vault was supposed to be opened before 9:00 am, and that there was an audit the next day. Tab H, Salomon Decl. ¶ 8 & Decl. Ex. 1, 6. Rea acknowledged that if she had written the actual time, she could have received an audit finding or a coaching, so she wrote 8:58 am to avoid noncompliance with the audit guidelines. *Id.* She wrote out a voluntary statement acknowledging that she falsely recorded the time on the night drop log "to remain under audit guidelines." *Id.*; *see also* Tab B, 2018 Rea Dep. 163. Thickstun admitted that there was no excuse for failing to open the night drop vault on August 4 as there were four employees present, and that she

and Rea falsified the log to avoid an audit finding. Thickstun also confirmed that she stated that she'd handle the debit card log, and took responsibility for the incident as she was a manager. Tab H, Salomon Decl. ¶ 9 & Decl. Ex. 1, 7.

Salomon then discussed the interviews with Fabrie, who believed that Rea's conduct warranted termination—a decision that Salomon agreed with as consistent with other cases of managerial falsification during her long tenure. Tab H, Salomon Decl. ¶ 10 & Decl. Ex. 1. On August 24, 2015, Salomon and Fabrie subsequently spoke with Advice & Counsel's Vincent Dubman, where they relayed the suggestion that Rea and Thickstun, due to their leadership roles, should be terminated for falsification of records; and that Yesko should receive a Final Written Warning for violating procedure by not immediately signing the debit card log, and for not preventing his manager Thickstun from signing. Tab C, Dubman Decl. ¶¶ 5-7, 11-13.

Dubman agreed that, consistent with the Bank's guidelines for falsification, managers Rea and Thickstun's falsification warranted their termination. *Id.* ¶¶ 8-11. Dubman likewise agreed that Yesko's conduct warranted discipline, but that under bank practices, the fact that Yesko was not a manager and had acquiesced in assistant manager Thickstun's decision to falsely sign her name to the debit card log warranted the lesser discipline of a Final Written Warning. *Id.* ¶¶ 12-13. Fabrie terminated Rea and Thickstun; Marie Warner disciplined Yesko, who reported to her. Tab I, Fabrie Dep. 32, Tab L, Warner Dep. 41.

Rea's termination took place on August 24, 2015. Tab E, Records Decl. ¶ 3. Rea's former supervisor Heather Subran-Marsh had no role in Rea's termination, and only learned that Rea had been terminated through Rea's involvement in litigation. Tab F, Marsh Dep. 36. Shortly after the termination, Rea sent a text message to numerous managers, confirming she had been fired for falsifying a night drop log, and "warning" the other managers about Magnusson, who had reported Rea's violation. Tab B, 2018 Rea Dep. 170, 196; Tab G, Fabrie Decl. ¶ 4 & Decl. Ex. 1.

### E.    Procedural History.

On April 1, 2016, Rea filed an EEOC charge against the Bank alleging age and sex discrimination. Tab K, EEOC Charge and Dismissal. A right-to-sue letter was mailed on December 8, 2016 and expired on or around March 8, 2017 with no suit filed. *Id.* On June 9, 2017, Rea was deposed by the plaintiff (one of her former employees) in *Whiteaker v. Bank of America*, No. 2:16-cv-13202 (E.D. Mich.). At that deposition, she admitted under oath that she and Thickstun "both engaged in falsification of a bank document," that it was an "error in judgment," and that she did not "know of anyone who has engaged in falsification of bank documents as a branch manager who has not been terminated." Tab D, 2017 Rea Dep. 128-29.

A few weeks after that deposition, Rea retained counsel and on July 24, 2017, filed a single-count complaint alleging that the Bank violated the FMLA "by issuing retaliatory discipline against Plaintiff and ultimately discharging Plaintiff because

-10-

she exercised her right to take an approved leave under the FMLA." R. 1, ¶ 33. In an interrogatory response, Rea clarified that her claim was limited to the termination, asserting damages only for lost wages "from the date of termination" and emotional distress "related to her termination." Tab M, Pl's Resp. to Def's Interrogs, p. 9.

Not long after the suit was filed, the Bank's counsel informed Rea's counsel that she had already admitted under oath, in the *Whiteaker* matter, that (1) she was terminated for falsifying a bank record; (2) that she *had*, in fact, committed that misconduct; (3) that Thickstun was also fired for falsification; and (4) that she was unaware of any manager who falsified a record who was *not* fired. *See* R. 16-7. The Bank's counsel attached the relevant portions of Rea's 2017 deposition transcript, and proposed that Rea voluntarily dismiss the case, given the prohibition on bad-faith and vexatious litigation. *Id.* In response, Rea tried to exclude her prior admission that she was terminated for records falsification by falsely accusing the Bank's counsel of committing an ethical violation when they deposed her in the *Whiteaker* matter. Magistrate Judge Davis rejected Rea's gambit, and held that Rea's 2017 testimony was admissible. R. 27. Rea then filed an objection to Magistrate Davis's ruling, which the Court overruled. R. 32. The Bank now asks for summary judgment.

## Argument

Lori Rea was terminated for falsifying a bank record. She's admitted to the misconduct under oath. She knows of no manager who falsified a record who *wasn't*

fired. And this Court has rejected her desperate attempt to preclude these dispositive admissions by falsely accusing the Bank's lawyers of ethical violations. What Rea is left with are speculative conspiracy theories in which she argues that supervisor Heather Subran-Marsh had some animus towards Rea for using FMLA leave—including a baseless claim that Subran-Marsh intentionally "understaffed" Rea's branch to make Rea feel anxious about using intermittent FMLA leave. Not only is this conspiracy theory disproven by Rea's admission that she was *never* refused requested leave, it is entirely irrelevant because Ms. Subran-Marsh was *reassigned* at the end of July 2015, and thus had no role in the investigation of Rea's August 4, 2015 records falsification or Rea's termination!

Even putting aside Rea's nonsensical arguments, Rea's complaints could not possibly be material: (1) she admitted to the falsification; (2) written policy and guidelines call for termination of a manager who engages in falsification; and (3) *three* independent people—Fabrie, Salomon, and Dubman—all independently agreed that termination was warranted for Rea's offense, and *none* of them knew that Rea had taken FMLA leave. This case was meritless when it was filed, and should have been withdrawn after the Court admitted Rea's prior admissions that she was terminated for falsification. The Court should grant summary judgment.

-12-

I.    **Rea cannot establish a *prima facie* FMLA retaliation claim.**

"To establish a prima facie case of FMLA retaliation, a plaintiff must show that (1) he engaged in an activity protected by the Act, (2) this exercise of his protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016). Here, Rea cannot show either the second or fourth element with respect to her termination.

A.    **The decision-maker Fabrie was unaware of Rea's FMLA leave, and thus cannot have retaliated as a matter of law.**

Rea's claim fails first because she has no evidence that decision-maker Stacey Fabrie was aware that Rea was on FMLA in August 2015. Rea admittedly has no such evidence; instead, she testified only that she *assumed* that Subran-Marsh would have Rea's "new bosses" about her FMLA. Tab B, 2018 Rea Dep. 175-78. Fabrie and Marsh both state that Rea's assumption was wrong: Fabrie did not know about Rea's FMLA status during the short time she supervised Rea. Tab A, Marsh Decl. ¶ 8; Tab G, Fabrie Decl. ¶ 3. The record is consistent with this, as:

- Rea's last application for FMLA leave was made while Heather Subran-Marsh was her supervisor. Rea did not use any intermittent leave during the time Fabrie was her supervisor. *See supra* at 6.

- Rea's falsification and termination occurred *very* shortly after Fabrie became Operations Market Manager: Fabrie became OMM on August 1, 2015; Rea falsified the bank record on August 4, 2015; the corporate

investigation began on August 5, 2015, and the termination occurred August 24, 2014. *Id.* ¶¶ 3, 9; Tab H, Salomon Decl. ¶ 4.

Rea, tellingly, appears to have had no idea that Fabrie was the person who made the termination decision: instead, she assumed it was the Consumer Banking Market Manager Marie Warner. *See* Tab B, 2018 Rea Dep. 77-78. Rea disliked Warner because, several years earlier, Warner *had* disciplined Rea for issues with her audits, among other things. *Id.* at 173-74. But Warner was not a decision-maker in Rea's termination, and only learned about it after Fabrie had made the termination decision. Tab L, Warner Dep. 25-26. That, in turn, is confirmed by the documentary record: the tip about Rea's falsification went to Fabrie; Fabrie was the person in contact with the Bank's investigator; and Fabrie was the person who called Advice & Counsel regarding proposed discipline for Rea. *Supra* at 7-10.

Even if Fabrie had known about Rea's leave (and she did not), Rea has no evidence that Fabrie held any FMLA-related animus. When Rea was asked at deposition to identify all her complaints about Fabrie, all she could conjure up was that in in April 2014, Fabrie—covering for Subran-Marsh during her maternity leave— asked Rea if she had arranged for staff coverage when Rea said she was going to be out of the office to take her mother to the doctor. Tab B, 2018 Rea Dep. 78-79. Rea had already arranged coverage, and took the leave. *Id.* That innocuous anecdote is the <u>only</u> "negative" thing Rea had to say about Fabrie. Rea believed the conversation took place before she applied for FMLA intermittent leave, and the record bears that

-14-

out: the conversation allegedly occurred during Subran-Marsh's maternity leave—which ran from April 2014 to July 2014—and Rea did not seek FMLA leave until September 2014.[2] *Id.* at 79-80; Tab E, Records Decl. ¶¶ 6, 8. This 2011 conversation obviously could not have reflected anti-FMLA bias then, let alone in 2015.[3]

Rea thus has no evidence that Fabrie knew about Rea's FMLA status, let alone that Fabrie had anti-FMLA animus. Thus, Fabrie's decision to terminate Rea could not have been FMLA retaliation as a matter of law. *See, e.g., Ferrari v. Ford Motor Co.*, 826 F.3d 885, 897–98 (6th Cir. 2016) (rejecting FMLA retaliation claim where there was no evidence that the "decision-makers knew about his FMLA leave").

**B.  Because Rea's admitted records falsification was undisputedly grounds for immediate termination, Rea cannot show that FMLA leave was a "but for" cause of the termination**

Rea also cannot show the necessary causal connection between her FMLA leave and her termination. In this circuit, "it seems that FMLA retaliation requires a

---

[2] And, of course, even under the FMLA, an employee is required to provide notice of foreseeable absences, including planned medical treatments, so as not to disrupt the employer's operations. *See, e.g.*, 29 C.F.R. § 825.302(a), (e). Fabrie asking Rea if she had enough employees at the branch to cover an absence, when Rea was in charge of scheduling, would plainly have been legitimate.

[3] Indeed, the record belies the notion that Fabrie would have retaliated against Rea for using FMLA leave if she *had* known. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003) (discussing "same-actor" inference). Fabrie was Rea's supervisor in 2011. Tab E, Records Decl. ¶¶ 6-7. During that time, Rea took FMLA leave to have knee surgery. Tab B, 2018 Rea Dep. 66-67. Fabrie did not terminate Rea as a result of her taking that leave, and Rea has no complaints about how the Bank handled her 2011 FMLA leave. *Id.* at 67-68.

showing of but-for causation." *Sharp v. Profitt*, 674 F. App'x 440, 451 (6th Cir. 2016) (citing statutory language and precedent); *accord Woida v. Genesys Reg'l Med. Ctr.*, 4 F. Supp. 3d 880, 899 (E.D. Mich. 2014) (requiring but-for causation for FMLA retaliation) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2533 (2013)). "But-for causation" is the "doctrine that causation exists only when the result would not have occurred without the [relevant] conduct." *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 323 (6th Cir. 2012). And as a matter of hornbook law, "[a]n act or omission is not regarded as a cause of an event if the particular event would have occurred without it." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (quoting *Prosser & Keaton on Torts* 265 (5th ed. 1984)).

Under this but-for standard of causation, therefore, if the plaintiff's termination would have happened *regardless* of the fact that the decision-maker had an allegedly unlawful animus, that animus is not a but-for cause of the termination. *See, e.g.*, *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009) (holding that when "two layers of bias-free analysis" by other decision-makers also concluded that plaintiff should terminated, alleged age animus by plaintiff's manager did not matter; as plaintiff "would have been fired anyway; age was not a but-for cause."); *Baqir v. Principi*, 434 F.3d 733, 744–745 (4th Cir. 2006) (same); *Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (where Plaintiff undisputedly violated a company policy which warranted termination, plaintiff could not establish

but-for causation *even if* the decision-maker could have age-based animus attributed to him); *cf. Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed… if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave").

Rea's claim fails under this authority, because even if she could prove that Fabrie had animus towards her for taking or using FMLA leave (and she cannot), the fact that Rea admittedly falsified a record would have led to her termination anyway. Here, Rea's only evidence of any alleged displeasure regarding her FMLA usage involves her *former* supervisor Heather Subran-Marsh. Rea claims, among other things, that Subran-Marsh somehow engineered understaffing of Rea's branch for the purpose of making Rea feel like she couldn't use leave (although Rea admits that she never actually was denied requested leave when she needed it.) *See supra* at 5-6. But Subran-Marsh transferred at the end of July 2015, and Stacey Fabrie became Rea's new supervisor as of August 1, 2015. *Supra* at 6. Rea falsified the night drop log on August 4, 2015. *See supra* at 6-7.

As noted above, there is no evidence that Fabrie even knew Rea had applied for FMLA leave in the few weeks that she was Rea's supervisor. But even if, somehow, such animus could be attributed to Fabrie, there can be no material dispute that Rea would have been fired anyway because of her admitted act of record falsification. As in the *Martino* case cited above, Fabrie's decision to terminate came after

consultation with *two* separate people, not accused of anti-FMLA animus, who agreed that termination was warranted: Deb Salomon and Vince Dubman. And as in the *Lindsey* case cited above, Rea's termination followed her admitted violation of a company policy that carries a penalty of termination.

Salomon, for her part, has investigated numerous alleged acts of records falsifications by Bank managers in her 25 years on the job, and knows it to be a serious violation of Bank policy. Tab H, Salomon Decl. ¶¶ 2, 4. In fact, Ms. Salomon is unaware of *any* manager who falsified a bank record who was *not* fired as a result. *Id.* ¶ 10. Salomon investigated Rea's records falsification, and obtained Rea's written confession. *Id.* ¶ 6-8. Afterwards, Salomon discussed the outcome of her investigation with Fabrie, including proposed punishment. Salomon agreed with Fabrie that termination was warranted for Rea's records falsification. *Id.* ¶ 10. Salomon's role in the termination was disclosed in discovery, but Rea did not depose Salomon, and Rea did not identify Salomon as someone who had any FMLA-related bias.

Likewise, Mr. Dubman was an experienced employee in the Bank's Advice & Counsel department. Tab C, Dubman Decl. ¶ 3. His job included consulting with field supervisors throughout the country, and advising them on the appropriate discipline for employee wrongdoing. *Id.* He knows that, as a matter of bank policy, records falsification by a manager in order to conceal a policy violation warrants

termination, even on a first offense. *Id.* ¶¶ 8-10 & Decl. Ex. 2. And Dubman's un-
derstanding is explicitly reflected in internal Advice & Counsel policy guidance doc-
ument on records falsification, which contains a hypothetical factual scenario that is
materially indistinguishable from what Rea did:

> Teller Operations Specialist Wanda was given the task of ensur-
> ing that the BCICR logs were up to date at all times and signed as re-
> quired. However, on June 1 the Banking Center had a surprise BCCR
> audit. During the audit, Wanda remembered that 2 weeks ago she had
> not performed an inventory of the working supply of safe deposit keys
> maintained. Wanda decided to initial and date the weekly BCICR log
> to show she did perform the inventory to avoid a BCCR audit finding.
> A teammate at the branch saw Wanda do this and reported the incident
> to the Banking Center Manager. Wanda has had no prior disciplinary
> action for policy and procedure violations or performance in the past.
>
> What would you recommend?
>
> *A: Termination due to falsifying a bank document.*

*Id.* ¶ 10 & Ex. 2 (emphasis in original.) Thus, when Salomon and Fabrie called Dub-
man following the investigation, to discuss what discipline Rea should be given,
Dubman recommended that Rea be terminated for the falsification. *Id.* ¶ 7. Rea was
fully aware of Dubman's role in the termination, but did not depose him, and she did
not identify Dubman as someone harboring FMLA-related bias.

There is thus no material dispute that Rea (1) falsified a bank record; (2) that
Bank policy calls for managers who falsify records to be terminated; and (3) that *two*
independent people—neither of whom knew Rea was on FMLA, and neither of

whom are accused of FMLA bias—agreed that Rea should be terminated.[4] She would have been fired for the records falsification, regardless of her FMLA usage. There is no but-for causation as a matter of law.

## II.   Rea cannot show that her termination for records falsification was pretext for FMLA retaliation.

Even if Rea could show a *prima facie* case—and she cannot—she still cannot show that the Bank's legitimate, non-discriminatory reason for terminating her (records falsification) was pretext for retaliation under the *McDonnell Douglas* burden-shifting analysis. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (applying *McDonnell Douglas* to FMLA retaliation claim). "Fraud and dishonesty constitute lawful, non-retaliatory bases for termination." *Id.* A plaintiff trying to show pretext "bears the burden of producing sufficient evidence from which the jury could reasonably reject [defendant's] explanation and infer that the defendant [ ] intentionally discriminated against him." *Id.* Rea has no such evidence.

As discussed at length throughout this brief, Rea has repeatedly admitted that she did, in fact, falsify a night drop log on August 2, 2018. She was investigated, signed a confession, and admitted it under oath at deposition. As Rea admits to the

---

[4] Moreover, Marie Warner—who at the time of her deposition had been involuntarily separated from Bank of America—acknowledged in response to Plaintiff's questioning that records falsification "always results in termination or almost always results in termination" and that Fabrie "would not have had necessarily the flexibility" to issue discipline to Rea besides termination. Tab L, Warner Dep. 14, 26.

factual basis of the misconduct that led to her termination, this reason cannot be false and pretextual. *Vickers v. UPS, Inc.*, 898 F.2d 155 (6th Cir. 1990) (table) (affirming summary judgment where plaintiff "readily admits the underlying facts which led to the [termination] decision" and had no other pretext evidence).

Rea further admits to the severity of her violation. She was familiar with the Bank's policies and Code of Conduct—a Code that makes clear that records falsification constitutes significant misconduct, *and* that managers have special obligations as leaders to refrain from such misconduct. *See* Tab B, 2018 Rea Dep. 42-44; *supra* at 3-4. She also has no evidence of any manager who was found to have falsified a record, but who was *not* terminated as a result. Tab D, 2017 Rea Dep. 129.[5] And Rea is aware that Amy Thickstun, the assistant manager who helped her falsify the night drop log, was also terminated. *See* Tab B, 2018 Rea Dep. 170.

Rea, instead, will apparently rest her entire pretext case on the fact that personal banker Sean Yesko was not terminated, but instead received a final written warning for his role in the debit-card log incident described *supra* at 7-8. It appears Rea intends to argue that Yesko also "falsified" a record.[6] *See* Tab J, Yesko Dep. 8-

---

[5] At her 2018 deposition, Rea tried to dance around her prior admission, offering up unsubstantiated speculation and hearsay about other employees who were rumored to have engaged in misconduct; again, however, she could not come up with any actual evidence of managers who the Bank knew had falsified a record, but did not punish the violation with termination. *See* Tab B, 2018 Rea Dep. 167-173.

[6] The log says that a person signing it is "certifying" that he accessed the vault and completed the activities "under dual control." Yesko did access the vault under dual

-21-

9 & Ex. 1. The Court need not address such a claim: an argument that Yesko *also* should have been fired does not help Rea under the "but-for" causation standard, *see supra* at 15-20, and so there would no need to look into pretext. In other words, Yesko's punishment—right or wrong—would not have changed the fact that *Rea's* conduct as a manager warranted termination.

In any event, this "Yesko should have been fired" theory is insufficient to show pretext because Yesko is not similarly situated to Rea for multiple reasons. For one thing, Rea was the branch manager; Yesko was a non-managerial personal banker. That alone vitiates any inference that the two were similarly situated. *See, e.g.*, *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 917 (6th Cir. 2013) (holding that plaintiff's status as "a manager… could reasonably justify holding her to a more stringent standard of conduct than … [the] assistant manager," and thus an assistant manager is not a valid comparator.); *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994) (holding that manager's responsibilities to maintain office is "reason to treat [manager] differently than his subordinates"); *Smith v. Bank One, N.A.*, 2000 WL 1206536 at *4, 229 F.3d 1153 (6th Cir. 2000)

---

control. Rea's theory is apparently that each signatory is also independently certifying the identity of the other, even though (1) the log does not say that, and (2) it is unclear how the log could be read that way, as the first person to sign could not "certify" information that the second person wouldn't necessarily have written. Rea's interpretation of policy cannot create a genuine issue of fact. *Sybrandt v. Home Depot,* 560 F.3d 553, 558–59 (6th Cir. 2009) ("disputes about the interpretation of company policy do not typically create genuine issues of material fact…").

(table) (bank branch manager and customer service representative are not similarly situated). Indeed, the Bank's Code of Conduct explicitly makes this point: as a manager, Rea has special obligations to avoid acts of dishonesty, and to serve as an example for her team. *Supra* at 3. One cannot compare the discipline given to a low-level employee with the discipline given to his *manager*, for an act of falsification that the manager has special, heightened duties to avoid.

Likewise, Rea and Yesko's conduct was not of comparable seriousness. *See Martinez*, 703 F.3d 911, 917 (6th Cir. 2013) ("to be found similarly situated, the "plaintiff and [her] proposed comparator must have engaged in acts of 'comparable seriousness.'"). As noted, Bank policy—as well as simple logic—dictate that even with an identical act, a bank *manager's* falsification of records is more serious than a low-level employee. But Yesko's actions were not same as Rea's. Rea intentionally placed false information into a bank record, stating that the night drop had been timely opened at 8:58 am when she knew that was not true—and she did it to cover up a violation of the night drop log policy. Yesko, by contrast, did not violate any underlying policy regarding accessing debit cards. He correctly opened the vault, under dual control, and he correctly signed his name as having opened it. *See supra* at 8-9; Tab I, Fabrie Dep. 25. Yesko's offense, in essence, was that he did not prevent his manager Amy Thickstun from signing *her* name on the log in place of Ms. Magnusson, once Thickstun told Yesko she'd be signing it. *See id.*

-23-

Fabrie, Salomon, and Dubman all explicitly considered this distinction in se-riousness between the manager Rea's outright falsification and cover-up with non-manager Yesko's failure to stop his manager's falsely signing her name, and Rea has no basis is to second-guess that judgment. Tab C, Dubman Decl. Ex. 1. Even if Yesko's actions were "falsification" in the same way Rea's actions were – and Rea has *no* evidence to suggest that they were – the Bank's written policy explicitly pro-vides that a lower level employee who engages in falsification due to the influence of his manager should receive a final written warning, while the manager should be terminated. *Id.* ¶ 13 & Decl. Ex. 2 at pp. 3, 7. That is consistent with what happened here: Yesko was supposed to sign; but Thickstun told him that she'd be signing for the other employee, and he acquiesced. Thickstun was terminated, while Yesko was given a final written warning. *Id.*

Ultimately, Rea was terminated for falsification. Her assistant manager Thick-stun was also terminated for the same act of falsification. And the punishment doled out to Rea, Thickstun, *and* Yesko were all fully consistent with existing bank policy. There is no evidence of pretext here.

## Conclusion

Lori Rea admittedly falsified a bank record. Records falsification by a man-ager is unambiguously grounds for immediate, first-offense termination. The assis-tant manager who helped her falsify the record was also fired. Rea admittedly knows

of no other manager who falsified a record who was *not* terminated. Her taking of

FMLA leave had nothing to do with her termination, let alone the "but for cause" of

it. Rea needs to finally take responsibility for her brazen misconduct. Summary judg-

ment should be granted.

<div style="margin-left: 40%">

Respectfully submitted,

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.

*s/Thomas J. Davis*
By:   Elizabeth P. Hardy (P37426)
       Thomas J. Davis (P78626)
Attorneys for Defendant
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
ehardy@kohp.com
tdavis@kohp.com

</div>

Dated:  November 27, 2018

-25-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2018 I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

s/*Thomas J. Davis*
Thomas J. Davis
280 N. Old Woodward Avenue
Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@kohp.com
(P37426)