Case 4:17-cv-12388-LVP-SDD   ECF No. 43-5, PageID.930   Filed 11/27/18   Page 1 of 11

**TAB D**

# WHITEAKER v. BANK OF AMERICA

# LORI ANN REA

### June 9, 2017

*Prepared for you by*



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company



US LEGAL SUPPORT
The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

LORI ANN REA
June 9, 2017

Page 5

1   Q.   If you feel like you need a break at any time, just
2        let me know, and as long as there is not a question
3        that is pending, that will be just fine.
4   A.   Okay.
5   Q.   All right.
6            MS. HARDY:  Lori, let me just say one
7        thing.  I introduced myself in the lobby.  I'm Liz
8        Hardy.  I represent the bank and Heather.
9            THE WITNESS:  Okay.
10           MS. HARDY:  I may have some objections from
11       time to time.  So if I speak, you should just stop and
12       let me say whatever I need to say for the record, and
13       then you can proceed.
14           THE WITNESS:  Okay.
15           MS. LORD:  Yeah, she may place things on
16       the record, but the rule is that you still give the
17       answer.
18           THE WITNESS:  Okay.
19           MS. HARDY:  Once I finish speaking.  We all
20       have to speak one at a time.  That's the concern.
21           THE WITNESS:  Okay.
22  BY MS. LORD:
23  Q.   What is your home address?
24  A.   3810 Kingsway Drive, Highland, Michigan 48356.
25  Q.   Do you have any plans on moving from that address?

Page 6

1   A.   Recently?
2   Q.   Any plans to move in the near future?
3   A.   Maybe five years.
4   Q.   Okay.
5   A.   Maybe five years.
6   Q.   Okay.  This is a subpoena for your attendance at the
7        trial in this matter, and we'll get in touch with you
8        when it gets closer in time, just to keep you up to
9        date if anything changes.
10           Are you currently working?
11  A.   No.
12  Q.   When were you last employed?
13  A.   August 24th, 2015.
14  Q.   And where were you working when you were last
15       employed?
16  A.   Bank of America on Milford Road in Highland Township,
17       Michigan.  I think the address was 1820.
18  Q.   Is that branch referred to as the Highland/Milford
19       branch?
20  A.   Yes.
21  Q.   When did you first begin working for the bank?  What
22       was your date of hire?
23  A.   Previous, like it was Bank of -- it was Michigan
24       National and all those.  Around July 1991, but then I
25       was grandfathered three and a half years back when it

Page 7

1        was Michigan National.  So it was July 1st, 1991, plus
2        three years and eight months, because I worked eight
3        years previous, and so they gave me back that time.
4   Q.   Okay.  So you were given some of that service credit
5        back --
6   A.   Yes.
7   Q.   -- but not all of it?
8   A.   No, I worked straight from July 1st, 1991, straight.
9   Q.   Okay.
10  A.   Okay.  But then previous to that I had taken off about
11       six years to have children, and I worked for Michigan
12       National eight -- three years and eight months.  So
13       when I came back, when they merged with Standard
14       Federal, there was something that they had to give me
15       my time back.  So that added three years and eight
16       months on top of the July 1st, 1991.
17  Q.   Okay.  Got you.  What was your job title when you last
18       worked for the company?
19  A.   I was banking center manager, vice president.
20  Q.   And if I slip and call that a branch manager, will you
21       understand --
22  A.   Yes.
23  Q.   -- that we are talking about the same thing?
24  A.   Yes.  Correct.
25  Q.   So it's super important that we don't talk over each

Page 8

1        other.  Otherwise, what the court reporter takes down
2        is going to be a big word salad.  So I know this is an
3        intimidating process.  You know, just try to listen to
4        the questions, and I'll try, likewise, to wait until
5        you are done speaking.  Okay?
6   A.   Yes.
7   Q.   Okay.  What were you doing prior to your branch
8        manager position in Highland/Milford?
9   A.   I was a branch manager in -- for Bank of America in
10       White Lake.
11  Q.   And when did you first begin your tenure in the
12       Highland/Milford branch?
13  A.   I believe I was there at least five years, maybe six.
14       They transferred me.
15  Q.   Okay.  So maybe in approximately 2010 or 2009 you
16       first became branch manager at Highland/Milford?
17  A.   Let me see.  I think my son was around 12 or 11.  So
18       if it's 11 years ago -- no, it was probably before
19       that, because I know my son had rode his bike up to my
20       office, and he was only in junior high.  So if he was
21       11 or 12, and he's 22.  So it's at least 2007, yeah.
22  Q.   Okay.  Why did you leave your employment with Bank of
23       America?
24  A.   They fired me.
25  Q.   Who specifically fired you?




LORI ANN REA
June 9, 2017

**Page 33**

1   number. I was so happy I made my number. And it was
2   a phone call for -- to go over your review, and the
3   first thing I was asked is, "What is this FMLA about?"
4       And I remember saying, "It's my mother."
5       And that's when I knew, forget it, there is
6   not going to be any time off.
7   Q. Who asked you, "What is this FMLA about?"
8   A. Heather.
9   Q. Okay. And you told her it was for your sick mother?
10  A. Yeah, and then she said, "Okay, fine." No. No. She
11  actually said, "Do your new bosses know about that?"
12      And I said, "I don't know. They have never
13  even talked to me yet, so I don't know if they know
14  about it."
15  Q. And who were your new bosses?
16  A. Marie Warner and Stacey Fabrie.
17  Q. So you even went over their head to talk to Heather to
18  get -- try to get approval for that FMLA? Am I
19  misunderstanding it?
20      MS. HARDY: Objection. Form.
21      THE WITNESS: No. No. I was on FMLA with
22  Heather. Because of my mother, it was intermittent,
23  so.
24  BY MS. LORD:
25  Q. Okay.

**Page 34**

1   A. I should be able to take off when -- she had
2   Alzheimer's, so she has good days, she had bad days.
3   And then it just didn't work. I just wish I would
4   have just -- sometimes I wish I would have just left,
5   or I wish I would have just taken three months
6   straight, because it was such a hassle.
7       You go in to work, and you have two people,
8   and now my dad calls. My mom is having a hard time,
9   and he needs help. He's 83, and I would -- who is
10  coming to come and help you? There is no one.
11  Q. Were you continuing to communicate the need for help
12  in your branch to Heather?
13  A. Yes, uh-huh.
14  Q. Were you doing this via email?
15  A. Yeah. Yep, by email, and when she would visit, I
16  would say, "I don't have any -- I don't have staff
17  enough."
18      And then I was going to try to step down to
19  be assistant manager, because I just -- I was trying
20  to step down so that way I don't have to -- 40 hours,
21  I'm done, I could leave.
22  Q. Okay. Let's keep going in order through your notes.
23  A. Okay.
24  Q. So I want to make sure -- okay.
25      I am going to reapply, but I

**Page 35**

1   don't know why, as I cannot take time
2   off for my mother to help --
3   A.      -- help care for her.
4   Q. Okay. Would you mind reading the rest of that page?
5   A.      I am not pulling my share,
6   may need to step down as I do not see
7   Bank of America ever letting me have
8   time off to take time needed, at least
9   one day a week.
10      And then I wrote my vacation time.
11      December 31st, still no
12  replacement for TOS or a part-time
13  teller.
14      So now I'm down one and a half people.
15  Q. Okay. And what happens -- the next entry looks like
16  it's January 4th?
17  A. Yes. They sent me Amy Thickstun, who was already on a
18  final written warning.
19  Q. And that is January 4th, 2015?
20  A. Uh-huh. Uh-huh. Yes. Sorry. Yes.
21  Q. How did you know Amy Thickstun was already on a final
22  written warning?
23  A. I get her file, but I believe her manager told me
24  that.
25  Q. Who was Amy's prior manager?

**Page 36**

1   A. I'm going to have to think, where did she come from.
2   You know, I can't think of where she came from. I
3   really don't remember.
4   Q. That's okay. How old was Amy?
5   A. Amy was 40, maybe 42.
6   Q. Okay. And what type of job did Amy do as part-time
7   teller -- as a TOS, excuse me?
8   A. Teller operation supervisor. She ran as a teller, did
9   the operations back there.
10  Q. Okay. And that was a part-time position or full-time?
11  A. Full, and I believe it was a promotion for her. I
12  don't think she was a TOS before.
13  Q. Okay. So did that still leave your staffing level
14  half a person down?
15  A. Yes.
16  Q. So let's continue to go through your timeline. Can
17  you, you know, read this next entry?
18  A. January 8th. Oh, that's a doctor appointment for my
19  mom. I couldn't get out of work in time. My dad had
20  to take her to the office. I took four hours of FMLA,
21  which meant my 83-year-old father had to try to dress
22  and bathe and get my mother moving.
23  Q. Okay. What is this next entry?
24  A.      January 21st, had year-end
25  review with Heather Subran-Marsh.




LORI ANN REA
June 9, 2017

Page 53

1  think so. If they let her go, if she went in June,
2  and I was fired in August, so I'm going to say
3  probably no. I don't remember who would have been
4  there.
5  Q. Okay. Let's keep moving forward in your notes --
6  A. Okay.
7  Q. -- and maybe we'll find the answer there. Okay. Can
8     you read the next entry, please?
9  A. What date do you want me to read?
10 Q. I think the next one is April 23rd, 2015.
11 A.         Heather called and said HR
12    has given her authority to fire Jan.
13        And I wrote, "Started with me October 24th,
14    '15," but maybe it was the 25th.
15        She had asked me if Jan was
16    there. I replied, "Yes." She asked
17    if I wanted to do it. I stated no,
18    she has only been with me six months,
19    that I felt that wasn't enough time to
20    justify firing her.
21        But I didn't say that to Heather.
22        Heather replied, "I am about
23    45 minutes or more away. Do you want
24    me to come and drive to your office to
25    fire her? I said, "Yes."

Page 54

1  Q. Okay. Can you read the next entry?
2  A.         Heather arrived. I told
3     Heather that Jan works tomorrow,
4     Friday, and she is off on vacation the
5     next week, which puts her into May,
6     into May 4th on her return to work.
7     Her husband is having back surgery in
8     May, and if she lets this go, I will
9     fire her in May to give her one more
10    month of insurance. She said, "That's
11    too bad, but no, we need to get this
12    done, as HR is aware."
13        And I put a quote mark there, so that must
14    have been what she said, "too bad."
15 Q. She said that is too bad?
16 A. "Too bad, but no, we need to get this done, as HR is
17    aware."
18 Q. All right. And that conversation happened on
19    April 23rd, about 3:30 --
20 A. 3:30, before Jan was let go.
21 Q. Before we continue on, let me ask you a question about
22    these notes. Were you taking them contemporaneously
23    with the events that you are recording?
24 A. What does that mean?
25 Q. At about the same time, like --

Page 55

1  A. I usually would get in my car and write them at the
2     end of the day. Sometimes I was just too overwhelmed,
3     I didn't write them. But these I know I wrote the
4     exact day it happened.
5  Q. Okay. So every entry in this notebook was the exact
6     date that it happened?
7  A. Well, with -- that day or the next day. It was -- so
8     it was fresh in my memory so I wouldn't forget.
9     That's why there's some spaces, because I didn't write
10    notes, and I didn't want to just try to recall what
11    day they were. So then I would just leave it blank.
12        MS. LORD: I'm going to mark this as an
13    exhibit, and then I'll just need another copy before
14    we go.
15        (Exhibit No. 24 marked.)
16 BY MS. LORD:
17 Q. All right. So let's continue in your timeline of
18    events.
19 A. Oh. May 4th:
20        PB and SS were transferred to
21    my office.
22 Q. So what is "PB"?
23 A. Personal banker.
24 Q. Okay.
25 A. And "SS" is service and sales. I thought it was

Page 56

1     associate, but service and sales.
2  Q. Specialist?
3  A. Oh, yes. Thank you.
4  Q. All right. And tell me -- you might have told me, but
5     all these names are getting mixed up in my head.
6        Who was the PB and the SSS that was
7     transferred into your office on May 4th?
8  A. Well, it would have been Sean Yesko, would have been
9     the personal banker. And the SSS, I'm not sure who
10    that would have been. Oh, that would have been Jamie,
11    yes.
12 Q. Okay. If you could keep reading.
13 A. Okay.
14        PB is on a written warning.
15    He opened up nine sales helping last
16    week of April.
17        That's when they sent him to just help
18    after Jan was terminated.
19        All those were sales, his
20    numbers went to his old office. I was
21    declined to have the numbers sent to
22    mine.
23 Q. Okay. Did you ask Heather for her assistance in
24    getting those numbers credited to your branch?
25 A. She was aware. She was definitely aware, because that

 

LORI ANN REA
June 9, 2017

Page 65

1 helpful if there were operations meetings?
2 A. No.
3 Q. What is the next page?
4 A. Oh, this is just what I wrote out. This is about me.
5 I wrote, "History and the days I could take off for
6 FMLA." Applied on the 2nd of September. I was
7 approved on September 23rd the approval letter arrived
8 at my house.
9    October 9th, I took from 9:00 a.m. to 11:00
10 p.m. because the night before I spent the night at my
11 mom's house, so I had had to drive back.
12    And then November 12th, I actually took a
13 day off. Oh, it was actually my day off, because I
14 worked Saturday, but they called for a mandatory call
15 night, and I was with my mother, and I was afraid that
16 I would get in trouble if I didn't go to this call
17 night. So I had to count it as an FMLA day so that
18 they couldn't hold it against me.
19    And then November 14th I took eight hours.
20    And then January 4th, I took four hours,
21 took my mom to the doctor.
22    January 28th was eight hours.
23    And April 16th was four hours for another
24 doctor appointment.
25 Q. So you've written "Actual time = 3" --

Page 66

1 A. -- "3 days and 2 hours."
2 Q. Okay. So these next two pages --
3 A. Oh, this is about me, sent an inquiry to a lawyer's
4 office regarding my termination to Bank of America.
5 Then I had an appointment with them. Let's see. I
6 called -- oh, I called Bank of America for my file,
7 sent file to lawyer for review. I had a lawyer
8 appointment. Lawyer advised to put in Civil Rights
9 for age discrimination. You have to do it within six
10 months. And then he seemed to think I had a case and
11 wants a $3,000 retainer.
12 Q. Did you ever file a lawsuit?
13 A. No. No, not yet. I don't know. I don't know what
14 I'm going to do.
15 Q. Okay. In front of you is a stack of exhibits that
16 we've used earlier in the case, and I'm going to have
17 you look first at Exhibit Number 15.
18 A. Okay.
19 Q. And just take a moment --
20    MS. HARDY: You are going to need to give
21 me a moment. Are those all exhibits from yesterday?
22    MS. LORD: They are a combination of from
23 yesterday and the prior deps.
24    MS. HARDY: I'm going to have to look with
25 the witness so I can see it, too. Okay.

Page 67

1    THE WITNESS: Okay.
2 BY MS. LORD:
3 Q. Do you recognize this document?
4 A. Yes.
5 Q. Is that your signature?
6 A. Yes.
7 Q. Whose idea was it to issue this final written warning
8 restated?
9 A. Well, it was advice and counsel.
10 Q. And remind me, was that Heather that told you to call
11 advice and counsel?
12 A. Yes.
13 Q. Okay. And did she tell you to call advice and counsel
14 for the purpose of issuing a final written warning
15 restated for Ms. Whiteaker?
16 A. No.
17 Q. What did she tell you was the reason to call advice
18 and counsel?
19 A. It was really because Jan was red, and she wanted to
20 call and let advice and counsel know that she was red
21 for one, two, three, four, five months.
22 Q. Okay.
23 A. Five out of 12 months she was red.
24 Q. If it had been your decision to make, would you have
25 called advice and counsel at that point?

Page 68

1    MS. HARDY: Objection. Form.
2    THE WITNESS: Well, I mean it was supposed
3 to be a rule that you call when everybody is red, but
4 I'm not sure all branches were following through with
5 that.
6 BY MS. LORD:
7 Q. What leads you to say that?
8 A. Because I think it's -- I think it was inconsistent.
9 I think some branches, managers would just -- I think
10 they were getting consistent at this point, but before
11 they weren't really consistent. Some managers would
12 call and then some wouldn't and -- I don't know.
13 Q. Okay. Can you turn to Exhibit Number 16? It's going
14 to be the next one chronologically, yes. Just take a
15 moment if you need to familiarize yourself with the
16 document.
17 A. Okay.
18 Q. Do you recognize Exhibit Number 16?
19 A. I know she was writing a rebuttal, because she told me
20 that. I don't remember if it was sent right to
21 Heather or if I stuck it in her file, but I know she
22 was writing this. So I probably did see it.
23 Q. Okay. Did Jan tell you that she was sending it to
24 Heather?
25 A. Yes.




LORI ANN REA
June 9, 2017

**Page 117**

1     would call me and say, "Oh, my God." You know, so
2     Wendy had already talked to her about that, her dress.
3  Q. Okay. So you had numerous concerns about choices she
4     was making --
5  A. Yes.
6  Q. -- that were impacting her performance?
7  A. Yes.
8  Q. Okay. And you called advice and counsel about her;
9     correct?
10 A. Yes.
11 Q. And Heather was on board with you calling advice and
12    counsel; correct?
13 A. Yes, I'm sure.
14 Q. To seek advice on how to handle this problem; correct?
15 A. I believe so, yes.
16 Q. And Heather thought it was a problem, too; correct?
17 A. I think so, yes.
18 Q. The final written warning you talked about Heather was
19    fully supportive of; correct?
20 A. It never -- I sent it to Heather.
21 Q. You have no reason to think she wasn't fully
22    supportive of the fact that the final written warning
23    had been prepared and was prepared to be delivered;
24    correct?
25 A. Right.

**Page 118**

1  Q. Okay. Now, Jeannine, despite her behavioral issues,
2     she was in the ramp-up period in September 2014;
3     correct?
4  A. Oh, boy. Let's see. I don't know. Was she? She
5     came in February, I think. I think she came in
6     February. March, April, May, June, July, August. I
7     don't know. I think September --
8  Q. Well, do you recall telling advice and counsel that,
9     when they asked about production results for
10    September, that she doesn't have numbers until
11    October, and that she has six months in role before
12    KPI to start, and that employee has been in red every
13    single month since starting, but that she was in the
14    ramp-up period?
15 A. Okay.
16 Q. All right. You don't disagree you told advice and
17    counsel that?
18 A. No. If that's what I said, then that's how it was.
19 Q. Okay. And you reached out to the CMM to talk about
20    Heather; correct?
21 A. To talk about Jeannie?
22 Q. Or Jeannie, I'm sorry.
23 A. Yes.
24 Q. You thought she should be moved; correct?
25 A. I don't know. I was not aware she was being moved. I

**Page 119**

1     don't believe I was. I think I just wanted her -- I
2     believe I just wanted -- she wasn't going to make it,
3     so I just wanted to move forward with a corrective
4     action.
5  Q. Did you agree with her being moved?
6  A. Yeah. I think so, yeah.
7  Q. And in that conversation you had with advice and
8     counsel, you told them that the CMM, which was Heather
9     at the time, wanted to move forward with a final
10    written warning for the employee?
11 A. If that's what I told HR, yeah. Yeah.
12 Q. You don't disagree with that?
13 A. No.
14 Q. Now, you testified earlier that you were told that
15    they were on the verge of firing Jeannine, and she
16    quit before they could do it.
17 A. That's what I heard, yes.
18 Q. And who did you hear that from?
19 A. You know, I'm not sure. I don't know if it was either
20    the manager or if it was April Johns. I don't really
21    remember, but I remember being told that, and I was --
22    that she wouldn't let herself be fired.
23 Q. Okay. And did you understand that she was on the
24    verge of being fired for poor numbers?
25 A. Yes.

**Page 120**

1  Q. So that was the reason that the bank had decided to
2     fire her?
3  A. Yes.
4  Q. Okay. But she got wind of it and quit before they
5     could carry it out?
6  A. Right.
7  Q. So Sandra Ward. Heather was not the CMM when Sandra
8     Ward was fired; correct?
9  A. No. No.
10 Q. Okay. She didn't have anything to do with Sandra Ward
11    being fired; correct?
12 A. No.
13 Q. I just want to go over the front of the first page of
14    Exhibit Number 24.
15 A. Okay.
16 Q. Now, Exhibit Number 24 is in a booklet; correct?
17 A. Yes.
18 Q. It's a bound booklet; correct?
19 A. Yes.
20 Q. So the pages -- did you write on these pages in
21    chronological order?
22 A. Yeah, except for this one. That was when I -- I
23    didn't write that because I had to look at -- I had to
24    actually call the doctor's office and see when I took
25    my mom to the doctor.

Pages 117 to 120



LORI ANN REA
June 9, 2017

### Page 121

1  Q.  When you are referring to this one, you are referring
2      to May 9, 2015 --
3  A.  2015, right.
4  Q.  -- at the top of the first page with all the
5      handwriting on it?
6  A.  Right.  Yes, because it wasn't in this book, and I --
7      the only way to figure out what day it was was to call
8      the office and find out when my mom had an
9      appointment.
10 Q.  So then the first recording you made in this book,
11     outside of what you wrote on the inside cover, was
12     June 11?
13 A.  Yes.
14 Q.  Was that June 11, 2014?
15 A.  Yes.
16 Q.  Are you sure?
17 A.  I'm trying to think.  I believe so.  I believe so.
18     Let's see.  Well, because I wrote that afterwards,
19     so -- let me see.  Yes.  Yes, because now we are in
20     2015, and here is when Jan was fired.  So yes.
21 Q.  All right.  So this is all in chronological order,
22     starting with June 11, 2014, carrying through July or
23     August -- I'm sorry, August 24, your termination?
24 A.  Yes.
25 Q.  Okay.  Of 2015?

### Page 122

1  A.  Yes.
2  Q.  So when did you start the practice of writing down
3      things that happened at work?
4  A.  I actually have some when -- when Marie was writing me
5      up, Marie Warner, she was writing me up for things I
6      wasn't even in the office for.  But because I'm the
7      manager, I'm responsible.  So I would come back from
8      vacation and have a write-up about a door being open.
9      And I'm like, "I was on vacation."
10             "Well, you are the manager."
11             So I had spoke to someone, someone who got
12     fired from Bank of America, and they said, "Start
13     writing everything down."  So I did.
14             And then Marie was transferred.  So she was
15     like 2013.  So she was switched, and then Heather came
16     in, and then things were going okay.  But then here is
17     where my mom started getting bad, and I remember
18     telling a manager, after this meeting, that I'm going
19     to have to go on FMLA, and the manager was --
20 Q.  What manager are you talking about?
21 A.  Kelly Novak.  And I said, "I think I'm going to have
22     to go on FMLA."
23             And she said, "Oh, my God."
24             Because that's a career-killer.
25             And I said, "I know, but what am I going to

### Page 123

1  do?"
2  Q.  Who is the woman you are referring to?  What was her
3      job?
4  A.  Branch manager.
5  Q.  At what branch?
6  A.  She was at Howell at the time.
7  Q.  So that was just somebody you were consulting with
8      and --
9  A.  No, I just was talking, because in this meeting I
10     started to break down and cry.  I believe I broke down
11     and started crying, and --
12 Q.  But the woman you are talking about was not somebody
13     you were asking for approval from --
14 A.  No, no, no.
15 Q.  -- just somebody that you knew that --
16 A.  It was just a conversation.  You know, "I'm sorry to
17     hear about your mom."
18             I said, "I know, I think I'm going to have
19     to do FMLA intermittent."
20             And she goes, "Oh, my God, no."
21             And I said, "I know.  I know."
22 Q.  So why did you start recording on June 11th?  Because
23     you were thinking that you --
24 A.  I'm thinking that I'm going to have to go on FMLA, and
25     I knew people that were fired from being on FMLA.  So

### Page 124

1      I called, well, I called one of the -- somebody that I
2      knew that was let go.  And he said, "You better write
3      everything down."
4              But I wasn't as good as I should have been,
5      because I should have wrote every single day, and I
6      just was emotionally drained and didn't.
7  Q.  So you were writing this down because you thought you
8      might have a legal problem, and you wanted a record?
9  A.  Yes, because -- yes.
10 Q.  Okay.  And did you get your FMLA approved by Heather?
11 A.  It was approved by --
12 Q.  HR?
13 A.  Yeah.
14 Q.  But Heather was supportive, wasn't she?
15 A.  Well, she knew about it, but I -- she knew about it.
16     Let's just say that.
17 Q.  Well, she talked to you about your mom; correct?  She
18     expressed concern about --
19 A.  Well, yeah, she expressed concern, and then she asked
20     me how many times I think I need to be out of office.
21     And I remember telling her, "As many times as I need
22     to be," and then, "I won't answer any more questions
23     about this."  And then she was quiet.  Because you are
24     not supposed to even ask me about my FMLA.  I'm
25     supposed to be able to take it.  And then she




LORI ANN REA
June 9, 2017

Page 125

1  transferred people out --
2  Q. Well, wait a minute. You don't think your manager has
3     a right to try to understand what you think your
4     schedule will be so that they can make business
5     arrangements to cover the business end when you are
6     gone?
7  A. Well, not when she puts me on call four times a day.
8     And I said to her, "Well, what do I do? What do I do
9     when I'm not in the office? Do you want my head
10    teller to call?"
11        She goes, "Why won't you be in the office?"
12        And I said, "Because I have a sick mother."
13        And that's when I thought, "This isn't
14    going to work." That's when I really thought it's not
15    going to work, because they wanted me in the office,
16    and I didn't know what to do. I didn't know.
17        So I switched with my brothers, mainly, and
18    I tried to go at night. But that is very exhausting,
19    working all day, and getting in a car and driving an
20    hour and staying at your mother's until 11:00 or
21    12:00, or spending the night, and then driving all the
22    way back home. But -- you know, but that's what I
23    did.
24        So that's why I was writing this, because I
25    thought -- and I even tried to step down. I tried to

Page 126

1  step down to assistant manager. I thought, well,
2  maybe that would be better, less responsibility, I
3  could say, you know, it's the manager's
4  responsibility, I need to.
5  Q. And why didn't you do that, if that's something you
6     were interested in?
7  A. Because Richard Anderson worked for me, and he used to
8     be a manager, and unfortunately, I know what his
9     salary was, and his salary was 58.2, and I wanted to
10    be dropped down to his salary, and they wouldn't do
11    it. They wanted to pay me 52. And I said, "No. I
12    know what Richard is getting paid."
13        And Heather said, "Well, that's very
14    unfortunate that you know what he makes."
15        So then I said, "Well, then I don't want
16    the job." Because I deserve -- I've been at the bank
17    longer than him, and I feel like I'm a better banker
18    than him, and I feel like I can do good sales. And I
19    said, "No, then I don't want it."
20 Q. And what job was that? What are you referring to?
21 A. Assistant manager, and he was a banker making 58.2,
22    and I wanted assistant manager. So that's why I
23    didn't take it. If I had been offered that, I would
24    have taken it.
25 Q. All right. And what -- at the Milford branch?

Page 127

1  A. No, it was at the busier branch in Brighton.
2  Q. So you -- were you offered the job?
3  A. At 52,000, yeah.
4  Q. And who offered you the job?
5  A. Heather.
6  Q. And who is responsible for setting the salary? Do you
7     know?
8  A. Well, I think HR, but I think your CMM can also go to
9     bat and say, "No, we need to pay her this." I mean
10    that's --
11 Q. You are just assuming that?
12 A. Well, a banker was making that much money, so yeah.
13    Yeah, I know they could have, because there were
14    bankers making that much money. So, you know --
15 Q. But did you inquire with HR?
16 A. No.
17 Q. Why not?
18 A. Why would I call HR and say, "I want to make more
19    money?" That would be my boss giving me the money.
20 Q. If you think that there are -- there is a legitimate
21    reason for it, and that the system allows for that
22    kind of adjustment, why would you not speak up and ask
23    HR about it?
24 A. Well, that was in June, May and June, and I know -- I
25    just didn't do it, because I just didn't want to take

Page 128

1  the pay cut. And when I already told them that
2  somebody else was making that money, it was, "Well,
3  that's unfortunate that you know."
4        So I wasn't going to pursue it any further.
5  It was just like, "Okay." And so I remember going
6  home to my husband and saying, "Okay, we'll just see
7  how this storm rides out."
8  Q. All right. Now, let's talk for a moment about your
9     termination.
10 A. Uh-huh.
11 Q. On the day when you recorded that the -- let's see --
12 A. Night drop?
13 Q. -- night drop was opened at 8:58 a.m. --
14 A. Right.
15 Q. -- it was really opened at 11:20 a.m.; correct?
16 A. Yes. Correct.
17 Q. So you knowingly recorded a false time; correct?
18 A. Yes. Correct.
19 Q. And you admitted that that was an error in judgment
20    when you were questioned by the investigatory team;
21    correct?
22 A. Yes.
23 Q. And it was an error in judgment; correct?
24 A. Yes, it was.
25 Q. And you did that along with the assistant bank




LORI ANN REA
June 9, 2017

Page 129

1   manager; correct?
2   A.  Yes.
3   Q.  So you both engaged in falsification of a bank
4       document; correct?
5   A.  Right, the time.
6   Q.  And you were both terminated for that; correct?
7   A.  Yes, we were.
8   Q.  And what was the assistant bank manager's name?
9   A.  Amy Thickstun.
10  Q.  How old is Amy?
11  A.  42, I think.
12  Q.  All right. Do you know of anyone who has engaged in
13      falsification of bank documents as a branch manager
14      who has not been terminated?
15  A.  No. If I said their name, I would never give it to
16      you. But I know -- I've had people call me and say,
17      "Oh, my God, we've done it at the branch all the
18      time."
19          And I'm like, "I know."
20          But I felt I was -- at that time I was on
21      FMLA. I felt I'm damned if I do and I'm damned if I
22      don't. If I don't open it, I'm fired. If I open it
23      and write the wrong time, I'm fired. So either way
24      I'm out. So I took a chance, you know, and so that
25      was probably -- you know, obviously the wrong

Page 130

1   decision, but, you know, things work out for a reason,
2   so.
3   Q.  Okay. Let's go to Patricia. What is the last name?
4   A.  Diakonis.
5   Q.  Diakonis. Okay. She was terminated in 2011?
6   A.  Uh-huh.
7   Q.  All right. And was that from your branch?
8   A.  Yes.
9   Q.  She was a personal banker?
10  A.  Yes.
11  Q.  Okay. And it was for numbers?
12  A.  Yes.
13  Q.  And you were familiar with her numbers?
14  A.  Yes.
15  Q.  All right. And the reasons for termination were all
16      accurate insofar as that they were citing accurate
17      numbers; correct?
18  A.  Correct.
19  Q.  And did you disagree with that termination?
20  A.  I was just transferred there, so I didn't really know
21      the branch very well. But I know Len Gardner was her
22      boss, and he's the one that directly told me to,
23      "Coach her up or coach her out."
24  Q.  Okay.
25  A.  And so that's what he told me to do. And so I would

Page 131

1   coach her, and I thought she was decent. I mean I
2   don't think we had the red-green-yellow system back
3   then.
4           So then I said, "Len, I think she is doing
5   all right."
6           And he said, "Well, you need to write down
7   every single thing she does, and then call HR every
8   week."
9   Q.  You don't have any reason to contend that her
10      termination was inconsistent with bank policy at that
11      point in time, do you?
12  A.  No, I'm sure it was numbers. I'm sure it had to do
13      with numbers, yeah.
14  Q.  And numbers are a reason to terminate people if they
15      are not meeting goals, correct, over a persistent
16      period of time?
17  A.  Yes.
18  Q.  And that was what led to her termination?
19  A.  Correct.
20  Q.  Okay. And Sandra Ward was terminated for the same
21      reason?
22  A.  Yes.
23  Q.  Persistent failure to meet numbers; correct?
24  A.  Yes.
25  Q.  And that was consistent with bank policy as well;

Page 132

1   correct?
2   A.  Yes.
3   Q.  And Jan Whiteaker was terminated for persistent
4       failure to meet numbers; correct?
5   A.  Yes.
6   Q.  And that was consistent with bank policy; correct?
7   A.  Yes.
8   Q.  So all three of those instances, you are not disputing
9       the fact that the bank had good cause to terminate
10      these employees, are you?
11          MS. LORD: Objection. Form and foundation.
12          THE WITNESS: Well, they weren't at their
13      numbers, and so, you know.
14  BY MS. HARDY:
15  Q.  You can't run a successful bank if you allow your
16      personal bankers to go month after month not being at
17      their numbers; correct?
18          MS. LORD: Objection. Form. Foundation.
19          THE WITNESS: I believe so.
20          MS. HARDY: I need to take a short break.
21      Oh, I have a question before I take a break.
22  BY MS. HARDY:
23  Q.  You mentioned that, in response to a question posed by
24      Ms. Whiteaker's counsel, that you saw an instance
25      where Heather was sitting in the branch staring at

Pages 129 to 132




Karen Griffin
313.456-3706

# CLASS SCHEDULE  DATE _____

NAME _____  SCHOOL _____

ADDRESS _____

EXHIBIT
Rea
24
6-9-17 cb

at one branch?

| | PERIOD | MON. | RM. | TUES. | RM. | WED. | RM. | THURS. | RM. | FRI. | RM. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 1 | age 58 | | Patricia Drakonus) | | | | | | | |
| 7/2014 | 2 | Sandra Waid | | age 52-54 | | | | | | | |
| | 3 | Jan Whiteacre | | | | | | 4-2015 | | age 59 | |
| | 4 | Lou Rea | | | | age 57 | | 8-2015 | | | |
| | 5 | | | | | | | | | | |
| | 6 | Quit due to treatment | | | | by | | | | Executive team | |
| | 7 | Leanne | | | | | | 52 | | | |
| | 8 | Sharon Sinclair | | | | | | age 50 | | | |
| | 9 | | | | | | | | | | |

History and the Days I could get off for FMLA.

Sept 2nd applied
Sept 23rd approved letter arrived at house

Oct 9th - 9-11  (watched mom night before)
Nov 10th (actual day off) took it as unpaid FMLA Day As there was a mandatory call night and I was with my mother & I was afraid I would get in trouble

Nov 14th  8 hours taken.
Jan 8th.  4hrs (Dr appt) mom
Jan 29   8 hrs
April 16.   4 hrs (Dr appt mom)

Actual time = 3 days 2 hours.